UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 11-CR-198-01** |
| **VERSUS** | **JUDGE HAIK** |
| **RICHARD J. BUSWELL et al.** | **MAGISTRATE JUDGE HANNA** |

*RULING*
(Under Seal)

Before the Court is the Government's Motion to Evaluate Conflict of Interest between the defendant and his retained attorney. (Rec. Doc. 74)

*Factual and Procedural Background*

On August 10, 2011, Defendant Richard J. Buswell was indicted on charges of conspiracy to commit securities fraud, investment advisor fraud, wire fraud, and mail fraud in violation of 18 U.S.C. §371; securities fraud in violation of 15 U.S.C. §§78j(b) and 78ff; 17 C.F.R. §240.10b-5; investment advisor fraud in violation of 15 U.S.C. §§80b-6 and 80b-17; wire fraud in violation of 18 U.S.C. §1343 with forfeiture allegations; and mail fraud in violation of 18 U.S.C. §1341 with forfeiture allegations. (Rec. Doc. 1). At his initial appearance and arraignment, the defendant indicated he would be represented by retained counsel, Daniel Stanford. (Rec. Doc. 12). The defendant was released pending trial subject to conditions. (Rec. Doc. 12, 13). Among

the standard conditions was that the defendant not violate any federal, state, or local law while on release. (Rec. Doc. 13).

On December 8, 2011, Buswell was arrested by local authorities and charged with two counts of manufacturing/distributing controlled dangerous substances, specifically synthetic cannabinoids, through a store or stores he owned/operated known as Curious Goods. On December 9, a Petition for Revocation of Pre-Trial Release was filed (Rec. Doc. 33) and an arrest warrant was issued (Rec. Doc. 35). There were three hearings which followed, one at the time of the defendant's initial appearance on December 9 (Rec. Doc. 37, Transcript at Rec. Doc. 50), a detention hearing on December 12 pending the revocation hearing (Rec. Doc. 4, Transcript at Rec. Doc. 51), and the revocation hearing on December 15 (Rec. Doc. 45, Transcript at Rec. Doc. 49).

The defendant was released to the custody of his mother pending the revocation hearing; however, at the revocation hearing this Court found that the defendant had violated multiple conditions of release and he was ordered detained pending trial. (Rec. Doc. 48). The defendant appealed the Revocation and Detention Order on February 22, 2012. (Rec. Doc. 68). The district court affirmed the decision and ordered the defendant detained pending trial. (Rec. Doc. 77). Trial is set for October 22, 2012.

On April 18, 2012, the government filed the instant motion asserting that the Drug Enforcement Administration(DEA) had opened its own investigation concerning the manufacture, supply, and distribution of synthetic cannabinoids in the Western District of

Louisiana.  In its motion, the government alleged that Daniel Stanford "played a significant role regarding Curious Goods and that he was well compensated for his participation."  (Rec. Doc. 74, p. 3).  The government alleged that Mr. Stanford made false representations to this Court relative to the Curious Goods business operation, his capacity as the person in charge of compliance and as attorney for Curious Goods personally and through a non-profit corporation he formed known as the Retail Compliance Association.  The government also alleged that Mr. Stanford accepted cash and property believed to have been generated from the sales at Curious Goods.

     In response to the government's motion, this Court set an evidentiary hearing for May 14, 2012.  Mr. Stanford appeared with the defendant who was placed under oath and found to be competent.  In addition, by court order, an attorney designated by the federal public defender's office, Ian Hipwell, appeared to advise the defendant if necessary.  At the hearing, the government outlined the allegations against Mr. Stanford through the testimony of the DEA case agent and presented evidence in support of its position.  Mr. Stanford denied the allegations of the government, cross-examined the government's witness, and offered additional evidence in his defense.  Mr. Stanford denied the existence of a conflict of his personal interests with those of his client, and argued the harm and hardship that would be visited upon the defendant should he be forced to engage new counsel in the securities fraud matter.  Mr. Stanford further asserted that the

Curious Goods matter is separate and unrelated to the securities fraud case without overlapping witnesses or evidence.

At the close of the evidence, the Court called for simultaneous briefing by the parties on the issues presented in the cases of *U.S. v. Snyder*, 707 F.2d 139 (5th Cir. 1983), *abrogated in part on other grounds, Wheat v. United States,* 486 U.S. 153 (1988) and *United States v. Sanchez Guerrero*, 546 F.3d 328, 332-333(5th Cir. 2008)*; and United States v. Grieg*, 967 F.2d 1018 (5th Cir. 1992), pertaining to the integrity of the judicial system as a grounds for disqualification of counsel as neither side had raised nor briefed the issue.  A second hearing was set for May 22 at which time a ruling was anticipated.  The Court also ordered Mr. Hipwell to review the evidence submitted by both sides and visit with the defendant, independent of Mr. Stanford, to advise him as necessary as to the issues that have been raised by the government.  At the hearing on May 22, Mr. Hipwell advised that he and his associate met with the defendant after the initial hearing.  After being placed under oath, the defendant confirmed that the meeting had taken place and that Mr. Hipwell had provided him with satisfactory advice.  (Rec. Doc. 83, pp. 8-9).

Prior to the hearing, both sides submitted briefs and the government submitted additional documentation in rebuttal to the representations made by Mr. Stanford at the time of the May 14 hearing.  This Court has now considered those exhibits.

On May 18, the Grand Jury indicted Buswell and two other defendants, Boyd Barrow and Joshua Espinoza, with one count of conspiracy to distribute a schedule I controlled dangerous substance.[1] The indictment charges that:

> From on or about March 1, 2011 to December 31, 2011 Curious Goods received approximately $5,000,000.00 in gross sales receipts. During this same time period, Curious Goods paid Pinnacle Products L.L.C./Pinnacle Products Group [the alleged distributor/supplier of synthetic cannabinoids] through a series of checks and wire transfers approximately $1,500,000.00.

The indictment contains forfeiture counts for funds in three different checking accounts (one was registered to Pinnacle Products L.L.C. and the other two were registered to Curious Goods L.L.C.), two vehicles, and a boat. However, the indictment was filed under seal and neither the defendant nor Mr. Stanford would have been made aware of the charges at the time of the hearing on May 22. The government did represent at the hearing that both the defendant and Mr. Stanford had been classified as "targets," as opposed to subjects, of the federal investigation although no target letter was produced. (Rec. Doc. 83, p. 4).

The Court placed the defendant under oath and advised the defendant that, at a minimum, the serious potential for conflict existed, if not an actual conflict, in the following non-exclusive particulars:

---

[1] See *United States v. Boyd Anthony Barrow, et. al.,* docket number 6:12-cr-146.

1. That if the government offered a plea package to the defendant that included a provision for cooperation in the case against Mr. Stanford, the latter could not properly advise him whether such cooperation would be in the defendant's best interest out of fear of what the defendant might say/do to implicate his attorney in the Curious Goods matter;

2. That Mr. Stanford had represented to the Court that he also represented Boyd Barrow, the principle for Pinnacle Products who was the distributor of the synthetic cannabinoids to Curious Goods. If the government offered a plea to Buswell, the government might look for Buswell to cooperate in the case against Mr. Barrow and, as such, Mr. Stanford's loyalties would be divided.

3. That the co-defendant in the securities case, Herbert S. Fouke, could be called to testify in the securities fraud case. Mr. Fouke was a former employee of Curious Goods, and therefore, Mr. Stanford could not properly cross-examine Mr. Fouke.[2]

After advising the defendant that the Court found a serious potential for conflict existed, the defendant waived the conflict which the Court finds was voluntary. (Rec. Doc. 83 p. 9). Mr. Stanford was asked if he had any comments, to which he responded in the negative. Subsequent to this hearing, Mr. Stanford was granted leave to respond to the allegations made by the United States Attorney's Office that he was a target of the Grand Jury Investigation. (Rec. Doc. 86). In his response, Mr Stanford submitted additional documentation which this Court has also considered. (Rec. Doc. 87).

---

[2] Rec. Doc. 83 at pp. 4-8.

After considering all of the evidence submitted, the briefing and arguments of counsel the Court makes the following findings of fact:

### *Findings of Fact*

1. In 2010, Richard Buswell acquired the first store known as Curious Goods. (Rec. Doc. 88, pp. 8-9). Beginning in 2011, one of the products sold by Curious Goods was a synthetic cannabinoid known as Mr. Miyagi "Timeout." (Id.) Mr. Miyagi "Timeout" was distributed to Curious Goods by Pinnacle Products, which was owned in part by Boyd Barrow. (Rec. Doc. 88, pp. 16-17). Mr. Miyagi "Timeout" is labeled as "not for human consumption" and on the label it is described as "potpourri;" however, it is well known in the public sector that it was purchased in order to be smoked to produce a high similar to that of marijuana. (Gov't Ex. 9-B, Gov't Ex. 5).

2. In July 2011, the Louisiana Legislature amended La. R.S. 40:964 to classify synthetic cannabinoids that contained the chemical group naphthoylindoles as controlled substances. La. R.S. 40:964.1 provides that a controlled substance analog shall be treated as a controlled substance. According to laboratory analysis, a chemical called AM-2201, that was detected in Mr. Miyagi "Timeout" samples purchased by undercover agents from separate Curious Goods locations, is a compound in the naphthoylindole family. (Gov't Ex. 1-3 introduced December 12, 1011).

3. On March 1, 2011, pursuant to 21 U.S.C. §811(h), the DEA promulgated an emergency ban of five chemicals, one of which was JWH-018 and its analogs. The DEA case agent testified that, according to a DEA chemist, AM-2201 is a direct analog of JWH-018. (Rec. Doc. 88, p. 12). Therefore, the distribution and sale of Mr. Miyagi "Timeout"as a synthetic cannabinoid by Pinnacle Products and Curious Goods in the spring and summer of 2011 was potentially a violation of federal and state criminal law.

4. In 2011, franchise agreements were executed which resulted in multiple Curious Goods locations in Louisiana. (Rec. Doc. 88, pp.8-9). The very first franchise agreement between Curious Goods L.L.C. and Brady J. Becker L.L.C. was executed July 15, 2011. (Deft's Ex. D-1). Four days earlier, on July 11, a check drawn on the account of Curious Goods, L.L.C. in the amount of $2500.00, which was signed by Richard Buswell and designated by him as legal fees, was issued to Daniel Stanford who cashed the check on July 20. (Gov't Ex. 3-A). Much of the paperwork associated with the franchise agreements was prepared by corporate counsel for Curious Goods, L.L.C., Barry Domingue, who has little or no experience as a criminal defense attorney in federal narcotics matters while Mr. Stanford is very experienced in criminal defense matters including narcotics violations. (Deft. Ex. 4, Rec. Doc. 88, pp. 21, 48-51,61-62, 81, 103). The DEA case agent testified that multiple individuals associated with Curious Goods indicated that Mr. Stanford, as part of the services provided by the Retail Compliance Association (RCA), was to provide advice on criminal matters, representation, and

compliance assistance for the Curious Goods franchisees. (Rec. Doc. 88, pp. 17-19, 43, 76-77). According to the case agent, even the defendant's brother Paul Buswell, stated Barry Domingue was the corporate attorney for Curious Goods and Richard Buswell hired Mr. Stanford as the criminal attorney and RCA attorney for Curious Goods. (Rec. Doc. 88 p. 41).

5. On its website, the national branch of the Retail Compliance Association states:

> There is much misinformation in the news about synthetic cannabinoids. . . An education on these compounds is vital to understanding exactly what a cannabinoid is and what products contain them and their chemical components. In many states, local law enforcement has raided head shops and small stores without warrants, without probable cause, and without any respect to those business owners constitutional rights, that is the reason the RCA was formed, to protect the rights of the store owners and to see that legitimate, reasonable laws are drafted that can be understood by the regular people like all of us. (Gov't. Ex. 2).

6. Materials provided by the RCA to its members included "The RCA Guide to the Federal Analog Act." (Gov't. Ex. 2). According to the DEA case agent, an individual named Daniel Francis was involved in lobbying efforts with the national RCA. (Rec. Doc. 88, p. 13, 66). On November 28, 2011, Mr. Stanford incorporated the Retail Compliance Association in Louisiana as a non-profit corporation. (Gov't. Ex. 1).[3] The President of the corporation is listed as Daniel Francis and the Director is Daniel Stanford. (Gov't. Ex. 1). The domicile address for the corporation is Mr. Stanford's law

---

[3] At the detention hearing on December 9, Mr. Stanford represented to this Court that the Louisiana corporation was not his. (Gov't. Ex. 6, p. 71).

office. (Gov't Ex. 1). In the Articles of Incorporation executed by Mr. Stanford, the following statement is made:

> Retail Compliance Association is formed to **establish and regulate** safety guidelines and **protocols for the marketing and sales of synthetic consumer compounds on a national, regional and local level** . . . (Deft's. Ex. 4) (emphasis added).

7. Although the national RCA website indicates membership dues to join the RCA were $400.00 annually, the DEA case agent testified that, according to various witnesses who were interviewed by the DEA, the Curious Goods franchisees were required to pay the RCA $1,000.00 to $5,000.00 per week in "dues" based on the profits from the stores in order to get legal assistance and compliance protection. (Gov't. Ex. 2, Rec. Doc. 88 pp. 15-20).

8. In November 2011, Mr. Stanford received four checks totaling $50,250.00 that were all designated as "RCA Dues" and all of which were deposited into Mr. Stanford's personal checking account, as opposed to his firm's account. (Gov't. Ex. 3, Rec. Doc. 88, p. 35). Two of the checks were drawn on the Curious Goods bank account and were signed by the defendant. (Gov't. Ex. 3-I, 3-K). However, one of those checks in the amount of $19,000.00 dated November 30 was designated for "Boyd's [Barrow] RCA dues to be deducted from Miyagi Bill." (Gov't Ex. 3-K). One of the remaining two checks was from Pinnacle Products in the amount of $6,250.00 (Gov't Ex. 3-D), and the last was a cashier's check drawn on Curious Goods's bank (Gov't . Ex. 3-E). The checks that had designations of RCA dues for Curious Goods were in the amount of $12,500.00

each and were dated November 14 and 28. (Gov't Ex. 3-E, 3-I). In addition to these checks, Mr. Stanford received three other checks from Pinnacle or Barrow, one of which was designated as a retainer, one of which was designated as legal services, and one of which was not designated at all. (Gov't Ex. 3-C, 3-F and 3-M).[4]

9. At the time of the hearings in December 2011, separate and apart from any of the checks designated as payment for "RCA dues," Mr. Stanford had received a check designated as a retainer from Pinnacle Products, a check designated as payment for legal services from its owner, Boyd Barrow, as well as multiple checks from Curious Goods, L.L.C. designated as payment for legal services from its owner/operator, Richard Buswell. Mr. Stanford represented to this Court that all of the checks received from Curious Goods were used solely to pay for legal services rendered in this case, that one of the checks from Pinnacle was to pay for an issue Mr. Barrow had in Lafayette City Court, and the others were for "research on RCA dues." (Rec. Doc. 88 pp.142). The check from Pinnacle designated as a retainer was dated October 28, 2011, and the records of the City Court matter indicate the accident at issue did not take place until November 20, 2011. (Gov't Ex. 3-C, Rec. Doc. 82, Exs. 1-2).[5]

---

[4] One of the Barrow/Pinnacle checks dated November 21, 2011 in the amount of $13,000.00 was returned for insufficient funds. (Gov't. Ex. 3-F)

[5] The Court notes there is a cashier's check showing Pinnacle as the remitter dated December 6 in the amount of $7421.00. (Gov't Ex. 3-M). Completely excluding the $13,000 check dated November 21, which was returned for insufficient funds, that would mean both Mr. Buswell and Mr. Barrow designated separate payments totalling $25,250.00 as RCA dues in the month of November.

10. On December 12, Mr. Stanford represented to this Court:

> Mr. Buswell and/or Curious Goods were relying in good faith on the distributor, and there's no evidence to show that Pinnacle was in any way affiliated with Curious Goods other than the distributor and a supplier . . . Whether or not the distributor misled Curious Goods and other entities that it supplies to, I don't know. I'm going to assume that it sounds like they did. (Gov't Ex. 8, P. 76).

11. The DEA case agent testified that several witnesses who were interviewed by the DEA indicated that a meeting was held at the home of the defendant on December 7, the day before local authorities executed warrants at the Curious Goods locations. (Rec. Doc. 88, pp. 16-18, 74-75). The case agent testified that the witnesses indicated Boyd Barrow, Dan Francis, and Daniel Stanford were present, among others, and that Mr. Stanford was there as the RCA and criminal attorney for Curious Goods. (Rec. Doc.88 pp. 16-19). He further testified that the witnesses stated that Mr. Francis gave them what amounts to instructions on how to deal with someone who approached the store and asked for a product that would get them high. (Rec. Doc. 88, p. 20). They were instructed to state the product was not for human consumption, and if a customer persisted, they were kicked out of the store because the "customers know what they want." (Id.) Further, if they had any questions, they were to call Mr. Stanford. (Id.) Two days before that meeting, on December 5, 2011, a check in the amount of $6,000.00 was issued from the Stanford Law Office account to Dan Francis and was designated "Contract Consultant-RCA." (Gov't. Ex. 4).

12

12. According to the DEA case agent, on the date local authorities executed search and arrest warrants and Curious Goods assets were frozen, a meeting was held at Mr. Stanford's law office at which the defendant, his brother Paul, Boyd Barrow, Barry Domingue, and others were present. (Rec. Doc. 88, p. 26-27). The agent testified that Paul Buswell advised that he gave Mr. Stanford a large sum of cash, perhaps $80,000.00 to $100,000.00, to hold in his trust account. (Rec. Doc. 88, p. 27). The agent testified that Paul Buswell did not intend for the money to be spent, however, Mr. Stanford allegedly did spend the money on legal fees. (Id., Gov't Ex. 11-A). In a recorded telephone conversation on January 31, 2012 between the defendant and Paul Buswell, Paul Buswell refers to himself as a "paying client" who is "waiting on Dan" to introduce new products or the stores may shut down because there were no products. (Gov't Ex. 11-D). On February 3, 2012, in a recorded conversation between Richard Buswell and his mother, Richard Buswell states "Dan is not Curious Goods' attorney . . . Dan has nothing to do with potpourri or Curious Goods." (Gov't Ex. 11-E).

### *Applicable Law and Discussion*

The Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25, 109 Sc.Ct. 2646, 105 L.Ed. 2d 528 (1989). While

that right is absolute, "an accused's right to a *particular* counsel is not." *United States v. Snyder*, 707 F.2d at 145. The right to counsel includes the "right to representation that is free from any conflict of interest." *United States v. Vaquero*, 997 F.2d 78, 89(5th Cir. 1993). "A conflict exists when defense counsel places himself in a position conducive to divided loyalties." *United States v. Carpenter*, 769 F.2d 258, 263 (5th Cir. 1985).

The court "must recognize a presumption in favor of [the defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a *serious potential for conflict*." *Wheat v. United States*, 486 U.S. at 164, *United States v. Gharbi*, 510 F.3d 550, 553 (5th Cir. 2007)*, United States v. Vasquez*, 995 F.2d 40,42 (5th Cir. 1993). Therefore, while Mr. Buswell's choice of Daniel Stanford as counsel is given presumptive weight, the pivotal issue is whether there is an actual conflict or serious potential for conflict as a result of that representation.

While this Court does not now find that the allegations against Mr. Stanford are true, it is enough that they exist to find that a serious potential for conflict exists. By virtue of the government's allegations, the undersigned finds that Mr. Stanford has been placed in the position of having to defend both himself and his client against criminal allegations by the government. This situation has been specifically found to be an actual conflict by the Fifth Circuit. See *United States v. Greig*, 967 F.2d 1018, 1022-23 (5th Cir. 1992). In *Greig*, the court cited *Government of Virgin Islands v. Zepp*, 748 F.2d 125, 136 (3d Cir. 1984), as persuasive authority for finding an actual conflict existed even though

defense counsel, as here, was not criminally charged, because "if it was ever known that he [defense counsel] was involved" in the alleged criminal activity, he could have faced severe disciplinary consequences. *Greig,* at 1023.

 Therefore, this Court finds there is a serious potential for conflict based on the evidence presented. While much is hearsay and may ultimately be proven untrue, if accepted at face value, Mr. Stanford's loyalties will at some point, if they are not already, be sharply divided. There is evidence that he now represents, or represented at very critical times, Boyd Barrow, the owner of the distributor of Mr. Miyagi "Timeout" to Curious Goods. There is evidence that he now represents, or represented at critical times, other owners/operators of Curious Goods locations. Richard Buswell is now faced with felony charges not only in conjunction with this case, but in conjunction with the Curious Goods operation. While he may never accept a plea offer from the government, the potential exists in every case for such a development, and if that potential were realized in this case, Mr. Buswell may be deprived of benefits he might otherwise be entitled to if he cooperated in the government's case against Mr. Stanford, who is a target of a grand jury investigation, or Mr. Stanford's other clients.

 Mr. Fouke, a co-defendant in this case who worked at Curious Goods, may be called upon to testify against Mr. Buswell in this case. Mr. Stanford, because of his alleged role as attorney and RCA representative for Curious Goods, could be precluded

from effective cross-examination because of his loyalties to his other clients and potentially himself.

The defendant was advised of these potential conflicts and was given an opportunity to confer with independent counsel. However, at the time the defendant was apprised of these potential conflicts, he was not aware that he and Mr. Barrow had actually been indicted by the Grand Jury. He chose to waive the potential conflicts as they existed at the time. Since then, the serious potential for conflict has grown even more.

Even assuming a conflict between Mr. Stanford and Mr. Buswell did not exist, the court has "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *United States v. Sanchez Guerrero*, 546 F.3d at 332-333, *United States v. Vasquez*, 995 F.2d at 42. In *United States v. Snyder*, the court upheld the disqualification of counsel based on the need to uphold the integrity of the judicial system:

> A court disqualifying an attorney may base its ruling on one of two grounds: (a) conflict of interest, and (b) integrity of the judicial system. Under the conflict of interest analysis, the trial judge ordinarily attempts to determine whether the interests of the attorney conflict with those of his client. A finding that there is a conflict does not, however, end the analysis. In *United States v. Garcia*, 517 F.2d 272(5th Cir. 1975), we recognized that defendants may waive their right to conflict-free representation, *Id*. at 272. An accused's right to waive conflict-free representation may not be absolute. Where the conflict of interest was so serious as to render a trial inherently unfair, we have held that the accused has been deprived of his right to effective assistance of counsel. *Uptain v. United States*, 692 F.2d 8, 10(5th Cir. 1982). We did not reach the issue whether under such

> circumstances, the right to effective assistance of counsel was waivable. *Id*. at 11. Similarly, we need not reach this issue here, for we conclude that disposition of this case is controlled by the second factor mentioned above, the integrity of the judicial process. As we held in *Woods*, supra, the policy concern underlying this factor is set out in Canon 9 of the A.B.A. Code of Professional Responsibility, which provides that an attorney "should avoid even the appearance of impropriety." "The purpose of Canon 9 is to preserve public confidence in the bar and in the legal process." *United States v. Hobson*, 672 F.2d at 828. Since a rigid application of Canon 9 may have other undesirable social costs, see *Woods*, 537 F.2d at 812-13, we have developed a two-pronged test governing disqualifications of attorneys under Canon 9. First, "there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." *Woods*, 537 F.2d at 813. Second, there must be likelihood of public suspicion or obloquy which would outweigh the social interest served by a lawyer's continued participation in a particular case. *Woods*, 537 F.2d at 813 n.12. "Under Canon 9, an attorney should be disqualified only when both of these standards have been satisfied." Id. See also *Hobson*, supra, 672 F.2d at 828.

*United States v. Snyder*, 707 F.2d at 145.

In *Hobson*, citing *Woods v. Covington County Bank,* 537 F.2d 804, 813 (5th Cir. 1976), the Eleventh Circuit, applying the two factors above, upheld the disqualification of defense counsel based on allegations of ethical wrongdoing under Canon 9 of Florida's Code of Professional Responsibility. The allegations of unethical conduct against defense counsel were that he had knowledge of some aspects of a marijuana smuggling operation that was the subject of his client's trial. The court of appeals held that even if the allegations were ultimately shown to be false, they were sufficient to warrant disqualification of retained counsel because of concern over the public perception of the bar and the legal system. *United States v. Hobson,* 672 F.2d at 828-829.

17

In the instant case, Daniel Stanford is bound by the Rules of Professional Conduct of the Louisiana State Bar Association.[6] Ignoring for the moment, the potential conflicts of interest involved in multiple representations of individuals or organizations (Rule 1.7 or 1.13), or accepting funds for "dues" that would be attributable to a non-profit corporation, the allegations by the government against Mr. Stanford, if ultimately proved to be true, include actions that would, at a minimum, be violative of multiple provisions of Rule 8.4 of the Rules of Professional Conduct. While it is true that Mr. Stanford has not been indicted or otherwise charged with criminal activity, it is clear from the record that he is a target of an ongoing criminal investigation by the government.

This Court finds that participating in the marketing and sale of approximately $5,000,000.00 worth of a product labeled as "potpourri," that is "not for human consumption," with the full knowledge that it is a synthetic cannabinoid purchased to be smoked to get a high is, at a minimum, conduct involving misrepresentation. This Court further finds that accepting funds that were arguably the subject of a known seizure of assets, then utilizing them as "legal fees" for another client is potentially violative of Rule 1.15 and 8.4. Finally, this Court finds that there is "at least a reasonable possibility" that at least one of these improprieties occurred.

Whether the allegations against Mr. Stanford ultimately prove to be true or false, they have been made, and they affect the appearance of the integrity of these proceedings.

---

[6] The Louisiana Rules of Professional Conduct at issue herein are nearly identical to the ABA Model Rules for Professional Conduct.

Many of the explanations provided to the Court in response to the allegations made by the government strain credulity. Others this Court simply must reject. The Court would indeed suffer obloquy if it allowed a defendant under indictment in a securities fraud case, in which it is alleged that the defendant defrauded millions of dollars from potential investors, to be represented by an attorney with whom he had a relationship illegally selling millions of dollars of synthetic marijuana labeled as "potpourri" that is "not for human consumption," and the Court so finds.

Therefore, having found both prongs satisfied, the undersigned does not and will not accept the defendant's waiver on this basis and on the basis of conflict. The court is given substantial latitude in refusing to accept the defendant's waiver in cases where an actual conflict may be demonstrated before trial and in cases where a potential for conflict is shown to exist, which may or may not become an actual conflict. *Wheat*, supra, at 163.

### *Conclusion*

For the reasons given above,

IT IS ORDERED that the Government's Motion to Evaluate Conflict of Interest [Rec. Doc. 74] is GRANTED and counsel for Defendant Daniel Stanford is DISQUALIFIED as counsel of record for defendant.

IT IS FURTHER ORDERED that the federal public defender or its CJA designee be appointed to represent Mr. Buswell until such time as retained counsel is substituted, if necessary.

Signed at Lafayette, Louisiana this 25th day of June 2012.

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE