UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 11-CR-198-01 |
| VERSUS | JUDGE HAIK |
| RICHARD J. BUSWELL et al. | MAGISTRATE JUDGE HANNA |

*RULING ON REHEARING*
**(Under Seal)**

Before the Court, pursuant to referral of the District Court, is the reconsideration of this Court's ruling on the Government's Motion to Evaluate Conflict of Interest (Rec. Doc. 74) between the defendant and his retained attorney in light of the evidence and argument presented in the defendant's appeal of said ruling. (Rec. Doc. 105) In particular, this Court is to consider the impact of an audio recording of an interview with the defendant, Richard Buswell, on April 5, 2012 obtained by agents of the Government concerning the matters at issue in an indictment originally returned against Buswell on May 18, 2012 hereinafter referred to as the "Curious Goods case".[1] For the reasons set forth, the undersigned sees no basis to change its previous ruling.

*Factual and Procedural Background*

The procedural history of this case is detailed in this Court's ruling of June 25,

---

[1] The indictment was returned against three defendants on May 18, 2012 and styled *United States of America v. Boyd Anthony Barrow*, et al, 12-cr-146. The Grand Jury returned a superceding indictment on September 4, 2012 styled *United States v. Alexander Derrick Reece*, et. al. bearing the same docket number.

2012. (Rec. Doc. 93) However, subsequent developments in the Curious Goods case are pertinent to this Court's reconsideration of its prior ruling.

On May 18, the Grand Jury indicted Buswell and two other defendants, Boyd Barrow and Joshua Espinoza, with one count of Conspiracy to Distribute a Schedule I Controlled Dangerous Substance. The original indictment charged that:

> From on or about March 1, 2011 to December 31, 2011 Curious Goods received approximately $5,000,000.00 in gross sales receipts. During this same time period, Curious Goods paid Pinnacle Products L.L.C./Pinnacle Products Group [the alleged distributor/supplier of synthetic cannabinoids] through a series of checks and wire transfers approximately $1,500,000.00.

The indictment contained forfeiture counts for funds in three different checking accounts (one was registered to Pinnacle Products L.L.C. and the other two were registered to Curious Goods L.L.C.), two vehicles, and a boat. However, the indictment was filed under seal and neither Buswell nor Mr. Stanford were aware of the charges at the time of the hearing on May 22. The government did represent at the hearing that both Buswell and Mr. Stanford had been classified as "targets," as opposed to subjects, of the federal investigation although no target letter was produced. (Rec. Doc. 83, p. 4).

At the Garcia hearing before Mr. Stanford had been indicted, the Court placed the defendant under oath and advised him that, at a minimum, the serious potential for conflict existed, if not an actual conflict, in the following non-exclusive particulars:

1. That if the government offered a plea package to the defendant that included a provision for cooperation in the case against Mr. Stanford, the latter could not properly

advise him whether such cooperation would be in the defendant's best interest out of fear of what the defendant might say/do to implicate his attorney in the Curious Goods matter;

2. That Mr. Stanford had represented to the Court that he also represented Boyd Barrow, the principle for Pinnacle Products who was the distributor of the synthetic cannabinoids to Curious Goods.  If the government offered a plea to Buswell, the government might look for Buswell to cooperate in the case against Mr. Barrow and, as such, Mr. Stanford's loyalties would be divided.

3. That the co-defendant in the securities case, Herbert S. Fouke, could be called to testify in the securities fraud case.  Mr. Fouke was a former employee of Curious Goods, and therefore, Mr. Stanford could not properly cross-examine Mr. Fouke.[2]

    After advising the defendant that the Court found a serious potential for conflict existed, the defendant waived the conflict which the Court found was voluntary. (Rec. Doc. 83 p. 9).  Subsequent to the hearing, Mr. Stanford was granted leave to respond to the allegations made by the United States Attorney's Office that he was a target of the Grand Jury Investigation. (Rec. Doc. 86).  In his response, Mr Stanford submitted additional documentation which this Court considered prior to issuing its ruling. (Rec. Doc. 87).  After considering all of the evidence, pleadings and argument this Court made the following findings of fact:

1. In 2010, Richard Buswell acquired the first store known as Curious Goods. (Rec. Doc. 88, pp. 8-9).  Beginning in 2011, one of the products sold by Curious Goods was a

---

[2]    Rec. Doc. 83 at pp. 4-8.

synthetic cannabinoid known as Mr. Miyagi "Timeout." (Id.) Mr. Miyagi "Timeout" was distributed to Curious Goods by Pinnacle Products, which was owned in part by Boyd Barrow. (Rec. Doc. 88, pp. 16-17). Mr. Miyagi "Timeout" is labeled as "not for human consumption" and on the label it is described as "potpourri;" however, it is well known in the public sector that it was purchased in order to be smoked to produce a high similar to that of marijuana. (Gov't Ex. 9-B, Gov't Ex. 5).

2. In July 2011, the Louisiana Legislature amended La. R.S. 40:964 to classify synthetic cannabinoids that contained the chemical group naphthoylindoles as controlled substances. La. R.S. 40:964.1 provides that a controlled substance analog shall be treated as a controlled substance. According to laboratory analysis, a chemical called AM-2201, that was detected in Mr. Miyagi "Timeout" samples purchased by undercover agents from separate Curious Goods locations, is a compound in the naphthoylindole family. (Gov't Ex. 1-3 introduced December 12, 1011).

3. On March 1, 2011, pursuant to 21 U.S.C. §811(h), the DEA promulgated an emergency ban of five chemicals, one of which was JWH-018 and its analogs. The DEA case agent testified that, according to a DEA chemist, AM-2201 is a direct analog of JWH-018. (Rec. Doc. 88, p. 12). Therefore, the distribution and sale of Mr. Miyagi "Timeout"as a synthetic cannabinoid by Pinnacle Products and Curious Goods in the spring and summer of 2011 was potentially a violation of federal and state criminal law.

4. In 2011, franchise agreements were executed which resulted in multiple Curious Goods locations in Louisiana. (Rec. Doc. 88, pp.8-9). The very first franchise agreement

between Curious Goods L.L.C. and Brady J. Becker L.L.C. was executed July 15, 2011. (Deft's Ex. D-1).  Four days earlier, on July 11, a check drawn on the account of Curious Goods, L.L.C. in the amount of $2500.00, which was signed by Richard Buswell and designated by him as legal fees, was issued to Daniel Stanford who cashed the check on July 20.  (Gov't Ex. 3-A).  Much of the paperwork associated with the franchise agreements was prepared by corporate counsel for Curious Goods, L.L.C., Barry Domingue, who has little or no experience as a criminal defense attorney in federal narcotics matters while Mr. Stanford is very experienced in criminal defense matters including narcotics violations.  (Deft. Ex. 4, Rec. Doc. 88, pp. 21, 48-51,61-62, 81, 103).  The DEA case agent testified that multiple individuals associated with Curious Goods indicated that Mr. Stanford, as part of the services provided by the Retail Compliance Association (RCA), was to provide advice on criminal matters, representation, and compliance assistance for the Curious Goods franchisees.  (Rec. Doc. 88, pp. 17-19, 43, 76-77).  According to the case agent, even the defendant's brother Paul Buswell, stated Barry Domingue was the corporate attorney for Curious Goods and Richard Buswell hired Mr. Stanford as the criminal attorney and RCA attorney for Curious Goods.  (Rec. Doc. 88 p. 41).

5. On its website, the national branch of the Retail Compliance Association states:

> There is much misinformation in the news about synthetic cannabinoids. . . An education on these compounds is vital to understanding exactly what a cannabinoid is and what products contain them and their chemical components. In many states, local law enforcement has raided head shops and small stores without warrants, without probable cause, and without any respect to those business owners constitutional rights, that is the reason the

>RCA was formed, to protect the rights of the store owners and to see that legitimate, reasonable laws are drafted that can be understood by the regular people like all of us. (Gov't. Ex. 2).

6. Materials provided by the RCA to its members included "The RCA Guide to the Federal Analog Act." (Gov't. Ex. 2). According to the DEA case agent, an individual named Daniel Francis was involved in lobbying efforts with the national RCA. (Rec. Doc. 88, p. 13, 66). On November 28, 2011, Mr. Stanford incorporated the Retail Compliance Association in Louisiana as a non-profit corporation. (Gov't. Ex. 1).[3] The President of the corporation is listed as Daniel Francis and the Director is Daniel Stanford. (Gov't. Ex. 1). The domicile address for the corporation is Mr. Stanford's law office. (Gov't Ex. 1). In the Articles of Incorporation executed by Mr. Stanford, the following statement is made:

>Retail Compliance Association is formed to **establish and regulate** safety guidelines and **protocols for the marketing and sales of synthetic consumer compounds on a national, regional and local level** . . . (Deft's. Ex. 4) (emphasis added).

7. Although the national RCA website indicates membership dues to join the RCA were $400.00 annually, the DEA case agent testified that, according to various witnesses who were interviewed by the DEA, the Curious Goods franchisees were required to pay the RCA $1,000.00 to $5,000.00 per week in "dues" based on the profits from the stores in order to get legal assistance and compliance protection. (Gov't. Ex. 2, Rec. Doc. 88 pp. 15-20).

---

[3] At the detention hearing on December 9, Mr. Stanford represented to this Court that the Louisiana corporation was not his. (Gov't. Ex. 6, p. 71).

8. In November 2011, Mr. Stanford received four checks totaling $50,250.00 that were all designated as "RCA Dues" and all of which were deposited into Mr. Stanford's personal checking account, as opposed to his firm's account. (Gov't. Ex. 3, Rec. Doc. 88, p. 35). Two of the checks were drawn on the Curious Goods bank account and were signed by the defendant. (Gov't. Ex. 3-I, 3-K). However, one of those checks in the amount of $19,000.00 dated November 30 was designated for "Boyd's [Barrow] RCA dues to be deducted from Miyagi Bill." (Gov't Ex. 3-K). One of the remaining two checks was from Pinnacle Products in the amount of $6,250.00 (Gov't Ex. 3-D), and the last was a cashier's check drawn on Curious Goods's bank (Gov't . Ex. 3-E). The checks that had designations of RCA dues for Curious Goods were in the amount of $12,500.00 each and were dated November 14 and 28. (Gov't Ex. 3-E, 3-I). In addition to these checks, Mr. Stanford received three other checks from Pinnacle or Barrow, one of which was designated as a retainer, one of which was designated as legal services, and one of which was not designated at all. (Gov't Ex. 3-C, 3-F and 3-M).[4]

9. At the time of the hearings in December 2011, separate and apart from any of the checks designated as payment for "RCA dues," Mr. Stanford had received a check designated as a retainer from Pinnacle Products, a check designated as payment for legal services from its owner, Boyd Barrow, as well as multiple checks from Curious Goods, L.L.C. designated as payment for legal services from its owner/operator, Richard

---

[4] One of the Barrow/Pinnacle checks dated November 21, 2011 in the amount of $13,000.00 was returned for insufficient funds. (Gov't. Ex. 3-F)

Buswell. Mr. Stanford represented to this Court that all of the checks received from Curious Goods were used solely to pay for legal services rendered in this case, that one of the checks from Pinnacle was to pay for an issue Mr. Barrow had in Lafayette City Court, and the others were for "research on RCA dues." (Rec. Doc. 88 pp.142). The check from Pinnacle designated as a retainer was dated October 28, 2011, and the records of the City Court matter indicate the accident at issue did not take place until November 20, 2011. (Gov't Ex. 3-C, Rec. Doc. 82, Exs. 1-2).[5]

10. On December 12, Mr. Stanford represented to this Court:

> Mr. Buswell and/or Curious Goods were relying in good faith on the
> distributor, and there's no evidence to show that Pinnacle was in any way
> affiliated with Curious Goods other than the distributor and a supplier . . .
> Whether or not the distributor misled Curious Goods and other entities that
> it supplies to, I don't know. I'm going to assume that it sounds like they did.
> (Gov't Ex. 8, P. 76).

11. The DEA case agent testified that several witnesses who were interviewed by the DEA indicated that a meeting was held at the home of the defendant on December 7, the day before local authorities executed warrants at the Curious Goods locations. (Rec. Doc. 88, pp. 16-18, 74-75). The case agent testified that the witnesses indicated Boyd Barrow, Dan Francis, and Daniel Stanford were present, among others, and that Mr. Stanford was there as the RCA and criminal attorney for Curious Goods. (Rec. Doc.88 pp. 16-19). He

---

[5] The Court notes there is a cashier's check showing Pinnacle as the remitter dated December 6 in the amount of $7421.00. (Gov't Ex. 3-M). Completely excluding the $13,000 check dated November 21, which was returned for insufficient funds, that would mean both Mr. Buswell and Mr. Barrow designated separate payments totalling $25,250.00 as RCA dues in the month of November.

further testified that the witnesses stated that Mr. Francis gave them what amounts to instructions on how to deal with someone who approached the store and asked for a product that would get them high. (Rec. Doc. 88, p. 20). They were instructed to state the product was not for human consumption, and if a customer persisted, they were kicked out of the store because the "customers know what they want." (Id.) Further, if they had any questions, they were to call Mr. Stanford. (Id.) Two days before that meeting, on December 5, 2011, a check in the amount of $6,000.00 was issued from the Stanford Law Office account to Dan Francis and was designated "Contract Consultant-RCA." (Gov't. Ex. 4).

12. According to the DEA case agent, on the date local authorities executed search and arrest warrants and Curious Goods assets were frozen, a meeting was held at Mr. Stanford's law office at which the defendant, his brother Paul, Boyd Barrow, Barry Domingue, and others were present. (Rec. Doc. 88, p. 26-27). The agent testified that Paul Buswell advised that he gave Mr. Stanford a large sum of cash, perhaps $80,000.00 to $100,000.00, to hold in his trust account. (Rec. Doc. 88, p. 27). The agent testified that Paul Buswell did not intend for the money to be spent, however, Mr. Stanford allegedly did spend the money on legal fees. (Id., Gov't Ex. 11-A). In a recorded telephone conversation on January 31, 2012 between the defendant and Paul Buswell, Paul Buswell refers to himself as a "paying client" who is "waiting on Dan" to introduce new products or the stores may shut down because there were no products. (Gov't Ex. 11-D). On February 3, 2012, in a recorded conversation between Richard Buswell and

his mother, Richard Buswell states "Dan is not Curious Goods' attorney . . . Dan has nothing to do with potpourri or Curious Goods." (Gov't Ex. 11-E).

On these factual findings, this Court disqualified Mr. Stanford as counsel for Buswell in this case and appointed the Office of the Federal Public Defender to defend him or recommend appointment from the CJA panel. Once Mr. Stanford was disqualified, the attorney assigned by the Office of the Federal Public Defender, Ian Hipwell, who was also assigned to represent Buswell in the Curious Goods case, obtained a copy of the recorded interview given to the government by Buswell on April 5. Mr. Stanford was provided a copy of that recording, and in his appeal of this Court's ruling, Mr. Stanford represented that he did not know the interview had been recorded and had not been provided notice that it was recorded, much less a copy of the recorded interview, at the time of the Garcia hearing. Mr. Stanford further argues the DEA agent who testified at the Garcia hearing, Agent Don DeSalvo, committed perjury based on statements made at the Garcia hearing compared to what was said during the interview.

On September 4, 2012 a Superceding Indictment was returned in which Buswell was indicted on one count of Conspiracy to Distribute and Possess with Intent to Distribute a Schedule I Controlled Dangerous Substance, one count of Conspiracy to Introduce and Cause to be Introduced Misbranded Drugs into Interstate Commerce, one count of Money Laundering Conspiracy and eight counts of Money Laundering.[6] Mr. Stanford was also indicted on the same conspiracy counts and ten counts of money

---

[6] *United States v. Reece, et al,* 12-cr-146, Rec Doc. 57.

laundering. Other newly named defendants in the Superceding Indictment include Curious Goods, LLC, Daniel Francis and another attorney associated with the Curious Goods operation, Barry Domingue.  There were also a number of new forfeiture allegations including specific assets of Mr. Stanford.

## *Discussion and Analysis*

This Court is deeply troubled by the lack of notice of the recorded interview and the "pretext" under which the recording was obtained.  After having carefully reviewed the transcript supplied by Mr. Stanford, there was no substantive conversation with Buswell concerning the instant matter, Buswell was given a *Miranda* warning early in the interview, he was told they were not to discuss anything about this litigation and there is no evidence that any of the statements made by Buswell were involuntary or coerced in any way.  However, when presented with the forfeiture paperwork Buswell stated "Dan is handling this now" and it would be naive at best to suggest the agents did not know he was referring to Mr. Stanford.

Whatever the impact of this interview is in the Curious Goods case, or in any other proceedings brought to address the propriety of the interview and the failure to disclose it prior to the Garcia hearing, this Court finds nothing contained in the interview to change the findings of fact previously made.  This Court did not base any factual findings on the interview of Buswell, and therefore, would not change any of those factual findings. Further, in light of the Superceding Indictment and the allegations made against Buswell, Barrow, Domingue and Stanford, this Court finds that the serious potential for conflict

has become far more acute. The reasons given for disqualification have not been undermined by this unfortunate episode, rather, those reasons have been rendered more meaningful in light of the Superceding Indictment. At the Garcia hearing Mr. Stanford recognized this possibility:

> The Court: Well, let me ask you this, Mr. Stanford. . . .You've not been indicted. A lot of this is conjecture. But let's suppose that they did get an indictment against you. Would you think you'd need to withdraw at that paoint if you are indicted?
>
> Mr. Stanford: I would, Judge, yes.[7]

While this Court does not now find that the allegations against Mr. Stanford are true, it is enough that they have been set forth by the Grand Jury to find that an actual conflict exists. By virtue of the government's allegations, if not disqualified, Mr. Stanford has been placed in the position of having to defend both himself and his client against criminal allegations by the Government. This situation has been specifically found to be an actual conflict by the Fifth Circuit. See *United States v. Greig*, 967 F.2d 1018, 1022-23 (5th Cir. 1992).

Therefore, this Court finds there is an actual conflict based on the evidence presented. Mr. Stanford's loyalties will at some point, if they are not already, be sharply divided. There is evidence that he now represents, or represented at very critical times,

---

[7] Rec. Doc. 88, p. 140.

Boyd Barrow, the owner of the distributor of Mr. Miyagi "Timeout" to Curious Goods. There is evidence that he now represents, or represented at critical times, other owners/operators of Curious Goods locations. Richard Buswell is now faced with felony charges in this case and in the Curious Goods case. While he may never accept a plea offer from the government, the potential exists in every case for such a development, and if that potential were realized in this case, Mr. Buswell may be deprived of benefits he might otherwise be entitled to if he cooperated in the Government's case against Mr. Stanford, who is an alleged co-conspirator.

It is also not lost on this Court that, in the course of Buswell, Stanford and Domingue defending themselves in the Curious Goods case, issues of attorney client privilege will arise which may involve ethical questions. Furthermore, at the potential expense of his ethical obligation in an effort to help in his own defense, Mr. Stanford is to inculpate Buswell in the Curious Goods case, that may adversely impact Buswell in this case should he be convicted. There is ample evidence to believe an actual conflict exists.

As set forth in this Court's original ruling, even assuming a conflict between Mr. Stanford and Mr. Buswell did not exist, the court has "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *United States v. Sanchez Guerrero*, 546 F.3d at 332-333, *United States v. Vasquez*, 995 F.2d at 42.

In the instant case, Mr. Stanford is bound by the Rules of Professional Conduct of

the Louisiana State Bar Association.[8]  Ignoring for the moment, the potential conflicts of interest involved in multiple representations of individuals or organizations (Rule 1.7 or 1.13), or accepting funds for "dues" that would be attributable to a non-profit corporation, the allegations by the government against Mr. Stanford, if ultimately proved to be true, include actions that would, at a minimum, be violative of multiple provisions of Rule 8.4 of the Rules of Professional Conduct.  The Government provided additional evidence that Mr. Stanford accepted funds that were arguably the subject of a known seizure of assets, then utilized them as "legal fees" for another client. (Rec. Doc. 108) Based on the Superceding Indictment and the additional evidence submitted by the Government in its objection to this appeal,  this Court finds that there is "at least a reasonable possibility" at least one of these ethical improprieties occurred.  Therefore, independent of the interview conducted by the agents, the allegations against Mr. Stanford affect the appearance of the integrity of these proceedings.

IT IS ORDERED that, after reconsideration, Daniel Stanford, as counsel for defendant Richard Buswell is DISQUALIFIED.

Signed at Lafayette, Louisiana this 28th day of September, 2012.

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[8]  The Louisiana Rules of Professional Conduct at issue herein are nearly identical to the ABA Model Rules for Professional Conduct.